

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| ERIC and ASHLEY ENGLISH, | ) | |
| | ) | |
| Appellants, | ) | WD86145 |
| v. | ) | |
| | ) | OPINION FILED: |
| | ) | July 2, 2024 |
| JASON and SARA BARNETT, et al., | ) | |
| | ) | |
| Respondents. | ) | |

**Appeal from the Circuit Court of Jackson County, Missouri
The Honorable Kyndra J. Stockdale, Judge**

**Before Division Two:** Thomas N. Chapman, Presiding Judge,
Karen King Mitchell and W. Douglas Thomson, Judges

Eric and Ashley English appeal the judgment of the trial court in favor of Jason

Barnett, Sara Barnett, and Barnett Real Estate Inspections, LLC, which (1) declares the

validity of an easement on the Englishes' property that includes a gravel driveway

abutting property owned by their neighbors, and (2) enjoins the Englishes from

preventing the Barnetts' use of the gravel driveway to access the Barnetts' property.  The

Englishes raise one point of error: that the trial court lacked substantial evidence to

support its finding that the property developers, in creating the easement burdening the

Englishes' property, intended to benefit the future owners of the property now owned by the Barnetts and thereby created a valid easement running with the land. We reverse.

## Background[1]

This appeal arises from a dispute between neighbors in Grain Valley, Missouri, about the validity of a recorded easement that purported to provide for adjoining landowners' use of a gravel driveway (Driveway) located on property owned by the Englishes.

Facts relating to the issue of whether an enforceable easement was created began in 2004, when developers Matthew Baker, Janet Barnhart, and Bruce Barnhart (Developers) decided to create the Meadow View Estates subdivision (Subdivision) from a portion of undeveloped land they owned in Grain Valley. The proposed Subdivision consisted of Lots 1, 2, and 3, with an unplatted strip of land running between Lots 2 and 3.[2] The remaining unplatted property owned by Developers, located south of Lots 1, 2, and 3, would later be known as Tracts D and E but was never made part of the Subdivision. Lots 1, 2, and 3 were located on the south side of East Stony Point School Road, with direct access to that road.

---

[1] "When the facts relevant to an issue are contested, the reviewing court defers to the trial court's assessment of the evidence." *White v. Dir. of Revenue*, 321 S.W.3d 298, 308 (Mo. banc 2010). However, where, as here, the evidence involves stipulated facts (derived from documents presented as stipulated exhibits by the parties) and not "resolution by the trial court of contested testimony," the question before us "is whether the trial court drew the proper legal conclusions from the facts stipulated." *Id.*

[2] Lot 2 was later purchased by the Barnetts and Lot 3 by Matthew and Erica Harshman.

In February 2004, developer Baker (as grantor), executed an ingress and egress easement to himself,[3] which was described in the recorded document as a "30 foot cross access easement" that was "irrevocable" and "binding upon" the grantor's "assigns" and "shall run with the land" (Original Easement). The Original Easement, recorded on March 5, 2004, started at East Stony Point School Road, at the north edge of the planned Subdivision, and extended southward between Lots 2 and 3, reaching Developers' unplatted land, south of the subdivision, that would become Tract E.

On June 22, 2004, the tax certificate creating the Subdivision's Lots 1, 2, and 3 was recorded. That same day, Developers filed and recorded a Declaration of Covenants, Conditions, and Restrictions (Subdivision Declaration), applying to Lots 1, 2, and 3, which stated a "desire[] to provide for the enhancement of the property values" and to place "use restrictions" on the lots, including (in Paragraph 14) a "Common Driveway" restriction that stated the following:

> Should owners of Lots 2 or 3 elect to use the common driveway easement provided for in Document 200410020682 [the Original Easement], they shall participate equally in the maintenance and repair of said driveway. Said easement shall grant the full and free right to all tract owners, their tenants, servants, visitors, and licensees, in common with all other tract owners having the like right, with or without automobile or on foot, for ingress and egress to each respective tract. Said easement is reserved as appurtenant to the land owned by the respective tract owners.

On July 2, 2004, Developers recorded a Certificate of Survey (Survey), creating Tracts D and E in Developers' unplatted land south of the Subdivision. Tract E included the unplatted strip of land between Lots 2 and 3. That same day, Developers filed a

---

[3] This easement was witnessed by the two other Developers, Janet Barnhart and Bruce Barnhart.

second Declaration of Covenants, Conditions, and Restrictions (Second Declaration), which applied to Tracts D and E, containing the following language in Paragraph 14:

> Common Driveway. A non-exclusive and permanent easement and right of way for a private driveway common to all tract owners is and will be reserved according to the recorded plat. Said easement shall grant the full and free right to all tract owners, their tenants, servants, visitors and licensees, in common with all other tract owners having the like right, with or without automobile or on foot, for ingress and egress to each respective tract. Said easement is reserved as appurtenant to the land owned by the respective tract owners.

In March 2005, Developers executed and recorded a second ingress and egress easement (Second Easement), purporting to create an "irrevocable easement and right of way over, across, around, and through the [Driveway] between lots 2 and 3"[4] and stating that it was binding on Developers as well as their "heirs, representatives, successors or assigns" and "shall run with the land." The 2004 Original Easement was then released in early April 2005.

Developers began selling lots to homeowners in 2005: (1) Lot 3 to the Harshmans in February[5]; (2) Lot 2 to the Barnetts in April; and (3) Tract E in May to Eric and Regina McKinney. In all sales, Developers used a general warranty deed stating, among other things, that each property was subject to "easements . . . of record, if any." The deeds to

---

[4] The Second Easement was "re-recorded" only to change the description in the first line of the legal description to "A Cross Access Easement," instead of "A 30.00 foot wide Cross Access Easement"; the rest of the legal description stayed the same.

[5] The sale of Lot 3 to the Harshmans occurred before the Second Easement was executed and recorded in March 2005 and before the Original Easement was released in April 2005.

the Barnetts and the McKinneys did not specifically reference the Second Easement or refer to the Subdivision Declaration or the Second Declaration.

In March 2008, Developers sold Tract D to Jason and Andrea Barnes. In March 2010, the McKinneys deeded to the Barneses a 5-foot strip of land, which was part of the original unplatted land running between Lots 2 and 3, and abutted the Barnetts' property, which deed was also subject to easements "of record, if any." The Barneses continue to own the Tract D property.

In 2015, the McKinneys deeded the Tract E property to the Englishes, who were informed of the Second Easement by their title insurance company. Although the Barnetts had access to their property directly from East Stoney Point School Road, they relied on the Second Easement to use the Driveway, primarily to access the southern portion of their property. The Barnetts' use of the Driveway also included use of the 5-foot strip owned by the Barneses.

The Englishes sued the Barnetts in May 2021; among other claims, they sought injunctive relief to prevent the Barnetts' use of the Driveway on grounds that no easement or other legal right existed to allow such use. The Barnetts counterclaimed, seeking (among other claims) an injunction and declaratory judgment that the Second Easement granted them the legal right to use the Driveway. The case proceeded to a bench trial in August 2022. The relevant evidence was introduced through 20 stipulated

5

exhibits.[6]  The trial court (1) declared that the Second Easement was a valid appurtenant easement located on the Englishes' property (as the servient estate) for the benefit of the Barnetts' property (as the dominant estate), based on its finding that Developers intended for the Second Easement to benefit future landowners, and (2) enjoined the Englishes from taking action to prevent the Barnetts' use of the Second Easement.  This appeal follows.

## Analysis

The Englishes raise one point of error: that the trial court lacked substantial evidence to support its finding that Developers, in creating the easement burdening the Englishes' property, intended to benefit the future owners of the property that Developers sold to the Barnetts and, therefore, created a valid easement running with the land.

## Standard of Review

In a bench-tried case, the trial court's judgment is affirmed on appeal "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).  If the appeal is from a declaratory judgment and injunctive relief following a bench trial, the standard is the same. *Allsberry v. Flynn*, 628 S.W.3d 392, 395 (Mo. banc 2021).  Here, the Englishes argue that the trial

---

[6] Although testimonial evidence reflected a factual dispute about the validity or creation of a valid easement, we find such evidence irrelevant to the question of law as to an easement's validity.  *See, e.g., White*, 321 S.W.3d at 308.

6

court lacked substantial evidence to support its judgment and that the evidence on which it must rely—the stipulated exhibits—was undisputed.

Where, as here, "the evidence is uncontroverted or admitted, so that the real issue is a legal one as to the legal effect of the evidence, there is no need to defer to the trial court's judgment." *Martin v. Dir. of Revenue*, 248 S.W.3d 685, 687 (Mo. App. W.D. 2008). Therefore, the issue on appeal is what legal standard a property owner/developer must meet to create an easement across its own property and preserve it for the benefit of future lot owners and whether the relevant evidence supported a finding that Developers met that standard in this case.

**A. For an easement to pass from a subdivision's developer to the purchaser of a lot, generally, the intent to grant an easement must be clear from the subdivision plat or be included in an individual deed.**

We recognize the "universal rule" that "[landowners] cannot have an easement over [their] own land." *Ball v. Gross*, 565 S.W.2d 685, 688 (Mo. App. 1978) (quoting *Bales v. Butts*, 274 S.W. 679, 681 (Mo. 1925)). "[T]o create an easement by deed there must be a dominant and servient estate, and 'they must not be lodged in the same person.'" *Id.* (quoting *Marshall v. Callahan*, 229 S.W.2d 730, 735 (Mo. App. 1950)). "This principle most often comes into play when the two properties affected by an easement, the dominant and servient estates, are merged under common ownership [and as a result] the easement is generally extinguished." *Woodling v. Polk*, 473 S.W.3d 233, 236 (Mo. App. E.D. 2015). But courts have held that the same principle applies in the reverse situation, when "a common landowner attempts to record an easement burdening one portion of his property for the benefit of another portion, usually in order to sell one

7

of the portions" in the future. *Id.* (citing *Bales*, 274 S.W. at 681). The Eastern District of this court has expressly rejected the argument that "an exception [to this general rule] exists for a developer who is preparing multiple adjoining lots for individual resale." *Id.* at 236 and n.3.

There cannot be an effective easement on property owned entirely by a developer because, until another person owns some of the property affected by the easement, the developer "ha[s] a perfect right to convey in any manner fairly agreed upon between it and the party to whom the first conveyance [is] made." *Gardner v. Maffitt*, 74 S.W.2d 604, 607 (Mo. 1934). Thus, the grant of an easement on property wholly owned by a developer has no effect until "a third party acquires title to some part of the property, thereby severing title." *Phelan v. Rosener*, 511 S.W.3d 431, 439 (Mo. App. E.D. 2017). Even when a developer conveys property to a third party, for an easement to be effective, the intent to convey the property subject to an easement must be clear. It is "the intention of the parties"—both the seller and buyer of the burdened property—that is the "paramount and controlling question" concerning an easement's validity. *Gardner*, 74 S.W.2d at 607, quoted in *Phelan*, 511 S.W.3d at 439.

The developer of a subdivision who wishes to include an easement may create that easement in one of two ways. "First, like any party creating an easement, a developer can include the easement in the individual deeds conveying each lot . . . at the time title is severed." *Woodling*, 473 S.W.3d at 237. But the easement must be described in the deed with specific language. *Id.* at 238 (finding an easement invalid when the deed's only reference to easements was that the property was "subject to . . . easements . . . now of

8

record, if any" because such language was "not specific enough"). And both the dominant and servient estates, as "[t]wo of the principal legal attributes of an easement," must be identified. *Phelan*, 511 S.W.3d at 438. Second, a developer may "create easements through a subdivision plat." *Woodling*, 473 S.W.3d at 237. While there is some precedent for upholding an easement based on a plat "if the deed conveying the [property] refers to the plat" or even "based on the plat alone," *id.,*[7] the "best practice [for developers] is to include the easement in both the plat and the deed" because that "ensures buyers are alerted to the easements." *Id*. "Though there is no precise specificity requirement regarding the language creating an easement, it is best to be as specific as possible, which would include a metes and bounds description where feasible." *Id.* "Restrictions, being in derogation of the fee conveyed, will not be extended by implication to include anything *not clearly expressed*." *Gardner*, 74 S.W.2d at 607 (emphasis added).

Here where the Original and Second Easements were created when Developers owned the property and thus the merger doctrine prevented the easement from taking effect, the facts do not support a finding that Developers created a valid easement making Lot 2 the dominant estate and Tract E the servient estate as to the Driveway that runs

---

[7] *Woodling* cited *Goad v. Bennett*, 408 S.W.2d 77 (Mo. App. 1972), for this point. *Woodling*, 473 S.W.3d at 237. But, in *Goad*, the parties did not dispute the existence of an easement created in the subdivision plat by the developer to grant access to roadways within the subdivision; the issue there was whether the easement allowed use by trucks that damaged the roadway. *Id.* at 80-81 (holding that the easement as worded did not bar use of trucks).

between Lots 2 and 3 of the Meadow View Estates subdivision either by the deeds conveying Lot 2 and Tract E or by a plat.

In February 2004, one of Developers, Baker, recorded an easement to himself creating an "irrevocable easement and right of way over" an unplatted strip of land between Lots 2 and 3. At that point, because Developers owned all of the relevant property, the easement was not valid under the merger doctrine. In June 2004, Developers filed a tax certificate for a plat creating the Subdivision made up of Lots 1-3. In the plat attached to the tax certificate, the strip of land between Lots 2 and 3 remained unplatted, with no designation that it was or would become subject to an easement. The plat also left unplatted the adjacent land to the south of Meadow View Estates owned by Developers, which would later be divided into Tracts D and E. The same day that they filed the tax certificate with the plat, Developers also filed the Subdivision Declaration referencing the Original Easement on the unplatted strip of land between Lots 2 and 3. But the plat did not refer to the Subdivision Declaration. Thus, no easement was created by the plat.

On March 1, 2005, Baker granted himself the Second Easement in the unplatted strip of land between Lots 2 and 3 (recorded on March 10, 2005, and rerecorded on April 13, 2005 to correct a clerical error). On April 5, 2005, Developers released the Original Easement. Again, because Developers owned all of the relevant property, under the "universal rule" and the merger doctrine, neither easement had any effect.[8] On April 5,

---

[8] Developers had already transferred Lot 3 to the Harshmans when Baker granted himself the Second Easement.

10

2005, Developers deeded Lot 2 to the Barnetts.[9]  The deed stated the conveyance was "subject to building lines, easements, restrictions, and conditions of record, if any," but otherwise did not specifically address an easement.  Because this language is identical to that found in *Woodling* to lack the necessary specificity to create an effective easement, 473 S.W.3d at 238, the deed did not convey an easement to the Driveway in favor of Lot 2.

On May 10, 2005, Developers deeded Tract E to the McKinneys[10] (who later deeded Tract E to the Englishes).  Tract E was originally created by the July 2004 Survey.  The Survey does label the strip of land between Lots 2 and 3 as an easement created by "Doc. No. 200410020682."  However, that reference is to the Original Easement released April 5, 2005, before the McKinney deed's execution.  And although the Survey was filed the same day as the Second Declaration purporting to recognize a "Common Driveway" easement, neither document references the other, and the Driveway easement recognized in the Second Declaration was for the benefit of Tract D, not Lot 2 or any other property.  Thus, even if the Survey could be considered a plat—a finding we do not make—the Survey does not support the creation of an easement burdening Tract E and benefitting Lot 2 because the Survey identified only a previously recorded easement, it made no reference to the Second Declaration, and it identified no servient estate at all,

---

[9] The Barnett deed was executed over a month after the Second Easement was executed on March 1, over three weeks after the Second Easement was first recorded on March 10, and a week *before* it was rerecorded on April 13.

[10] The McKinney deed was executed over two months after the Second Easement was executed, a month after it was recorded, and 27 days after it was rerecorded.

11

thus lacking the necessary specificity to create an easement under *Woodling*, 473 S.W.3d at 238. As for the deed, like the Barnett deed, the McKinney deed failed to specifically identify any easement, stating only that it was "subject to building lines, easements, restrictions, and conditions of record, if any." The McKinney deed makes no reference to the Second Easement either directly or by reference to the Survey. Because the deed's language lacks the necessary specificity to create an effective easement, *see id.*, the deed did not create a valid easement.

The facts surrounding the conveyances by Developers to the Barnetts and the McKinneys failed to create a valid easement over the Driveway for the benefit of Lot 2 pursuant to the rule articulated in *Woodling. Id.*

**B. *Phelan* does not create an exception to the merger rule that applies to the case.**

The Barnetts rely on *Phelan* to argue that there is an exception to the general rule—that an easement, created by a developer before conveying property, is ineffective unless the easement is included in a plat for the subdivision or is included, with specificity, in individual deeds conveying lots in the subdivision—that makes an easement on the Driveway in this case effective.[11] We disagree. To the extent that *Phelan* creates an exception to the general rule articulated in *Woodling* (applying the merger rule to developers of subdivisions who create an easement prior to conveying

---

[11] Missouri has not followed the lead of other states in creating a more general exemption for developers from the merger doctrine. *See Woodling*, 473 S.W.3d at 236 n.3.

individual lots), the exception is narrow and applies only to contemporaneous actions by the developer and buyer that may be read in combination with the language of a conveyance, as a single undertaking, to reflect the intent to create an easement. *See Phelan*, 511 S.W.3d at 440-41.

*Phelan* involved a private road easement that purportedly ran over property originally owned by a single landowner (Landowner). *Id.* at 434-35. That property was eventually subdivided into five lots and conveyed by deed. *Id.* at 436. The first of the five lots was conveyed on July 2, 1982. *Id.* That same day, Landowner created a Road Maintenance Agreement (RMA) that purported to create a "private roadway easement." *Id.* at 435. The RMA was recorded later that same day. *Id.* at 436. In *Phelan*, the court concluded that both the specific terms of the deed and the circumstances of its creation supported the parties' intent to create a valid easement. *Id.* at 440-41.

The first *Phelan* deed contained "an identical description" of the easement that was contained in the RMA. *Id.* at 440. Landowner created and recorded the RMA "the same day they sold [the burdened property] to Appellants' predecessor in title."[12] *Id.* Appellants, as owners of the burdened property, argued that the merger doctrine prevented creation of the easement because Landowner owned the entire tract at the moment the RMA was executed. *Id.* at 439. But Landowner's title was deemed timely severed, given the "contemporaneous" conveyance of the deed to one parcel and creation of the easement through the RMA. *Id.* at 440 (finding that "the documents must be read

---

[12] Although not completely clear in the opinion, it appears that the RMA was created before the conveyance and recorded afterwards.

together" and thus the easement was not merged into Landowner's title). "Once a third party acquires title to some part of the property, thereby severing title, the grant of the easement becomes effective." *Id.* at 439.

The *Phelan* opinion cites *Woodling* but does not purport to overturn or limit it. *See id.* at 440. Rather, the court found that under the unique facts of *Phelan* the court could consider other *contemporaneous* actions by the parties to determine whether it was the parties' intent to create an easement by the conveyence. *Id.* The deed of conveyance and the RMA "related to the same subject[,] were executed contemporaneously; and the RMA explained and fully consummated the intention of the parties to the deed and, therefore, the documents must be read together." *Id.*.[13]

To the extent that *Phelan* can be read to create an exception to the merger doctrine as articulated in *Woodling*, the exception is narrow and limited to its facts: an easement survives the merger doctrine if (1) the easement is created so close in time to the third-party deed that both documents were meant to be part of one undertaking, *and* (2) the

---

[13] The *Phelan* court's analysis of the effect of "contemporaneous" actions on the conveyance by deed focused on the transfer on the first of five lots. *Phelan v. Rosener*, 511 S.W.3d 431, 436 (Mo. App. E.D. 2017). Other lots were subsequently conveyed. *Id.* The court found that the "terms of the easement itself evidenced an intent to benefit and burden" all of the land. *Id.* at 441. Thus, the lot originally conveyed and the remaining land still owned by Landowner at the time of that conveyance (and later sold as separate lots) all became both dominant and servient estates. *Id.* at 440-41. The fact that later deeds conveying parcels *benefitting* from the easement did not mention the easement was "inconsequential" because the servient and dominant character of the estates had been created at the time of the first conveyance and the "easement passed by deed . . . regardless of whether or not the easement was specifically mentioned in the transfer." *Id.* at 441. Thus, we reject the Barnetts' argument that the fact that a later conveyance was not contemporaneous to the creation of the RMA supports a broader reading of the holding in *Phelan*.

deed to the third party specifically incorporates or describes the easement. *Id.* at 440-41.

When those two conditions are met, there is clear intent on behalf of both parties that the

property be burdened by the easement. *Id.*

Here, the facts fail to satisfy *Phelan*'s two-part test, thus no easement was created

due to the merger doctrine. First, there was no contemporaneous, same-day execution of

the 2005 Second Easement[14] with Developers' conveyance of any property. The deeds to

Lot 2 (Barnett) and Tract E (McKinney) were both executed over a month after the

Second Easement was executed and originally recorded.[15]

Second, neither deed incorporated the Second Easement by reference, description,

or document number.[16] Both deeds stated simply that the property was subject to

"easements . . . of record, if any"—virtually identical to the wording deemed "not

specific enough" in *Woodling*, 473 S.W.3d at 238.

By focusing on the intent of Developers and their actions weeks before or after the

conveyances to the Barnetts and McKinneys, the Barnetts are, in effect, asking us to

consider actions that were not *contemporaneous* and adopt a totality of the circumstances

analysis to determine if a valid easement exists. In other words, they ask us to conclude

---

[14] The Original Easement was released before either of the Barnett or McKinney deeds were recorded.

[15] And the Barnetts' deed was executed a week before the Second Easement was rerecorded.

[16] The McKinney deed does incorporate by reference the 2004 Survey, which appears to show the Original Easement. But by the date the McKinney deed was executed, the Original Easement had been released. Also, neither deed mentions the Subdivision Declaration or the Second Declaration that referred to the "Common Driveway," with the Subdivision Declaration referring only to the Original Easement and doing so by its recorded document number.

that under *Phelan* a valid easement exists because the actions taken by Developers over a period of several weeks indicate that it was Developers' intent to create an easement allowing the Barnetts to use the driveway between lots 2 and 3. This approach would stretch the meaning of "contemporaneous" well beyond what was contemplated in *Phelan* and allow the consideration of actions that were not part of a single undertaking. We acknowledge that the record contains evidence of Developers' intent to create an easement that would run with the land and benefit future Subdivision homeowners, but that will always be the case when the merger doctrine is applied to actions by a developer to create an easement before conveying property. The creation of an enforceable easement turns on the legal question of whether Developers succeeded in creating a valid easement in 2005, not simply the fact question of Developers' intent. Moreover, a crucial distinction in *Phelan* was that the owners of the servient estates always knew specifically which properties would benefit from the easement—knowledge which is absent here. *See Phelan*, 511 S.W.3d at 441.

The *Phelan* court provides no exception applicable to this case because *Phelan* merely distinguished *Woodling* on its facts. Here, the facts do not fit the narrow *Phelan* exception because the Second Easement and the Barnett and McKinney deeds were not executed contemporaneously or otherwise clearly part of the one undertaking. Therefore, we are not compelled to read those documents together. Because Developers failed to create a valid easement under the merger doctrine as articulated in *Woodling* and the documents do not fit the *Phelan* exception, we find that the Englishes' property is not

16

subject to an easement allowing the Barnetts or other adjoining property owners to use the Driveway.[17]

Appellants' Point I is granted.

## Conclusion

Here, Developers did not execute a plat or a deed of conveyance that created an easement in favor of the Barnetts, nor was the creation of the Second Easement, when Developers owned all of the relevant property, so close in time to the conveyance of property by deed to either the Barnetts or McKinneys that the Second Easement and either deed could be considered part of one undertaking. Further, neither deed specifically incorporated or described the easement. Therefore, we are not compelled to

---

[17] Mindful of the requirement that "[a] judgment which affects title to real estate must describe the land in question with enough certainty to support a later conveyance of the property," *Creech v. Noyes*, 78 S.W.3d 223, 225 (Mo. App. E.D. 2002), and to clarify for purposes of certainty should any party wish to record this opinion, the court has found that the property currently owned by Eric S. English and Ashley B. English and referred to herein as Tract E is not subject to an easement in favor of the Barnetts' property, which purported easement is legally described as follows:

> A Cross Access Easement in the Southeast Quarter of the Southeast Quarter of Section 10, Township 48 North, Range 30 West of the Fifth Principle Meridian in Jackson County, Missouri, being further described as follows: Commencing at the Northwest corner of LOT 3, MEADOW VIEW ESTATES, a subdivision in Jackson County, Missouri; thence South 01 degrees 56 minutes 03 seconds West along the West line of said lot 3 a distance of 654.00 feet to the Southwest corner of said lot 3; thence North 88 degrees 04 minutes 01 seconds West a distance of 64.03 feet top the Southeast corner of lot 2, Meadow View Estates; thence North 01 degrees 54 minutes 40 seconds East along the East line of said lot 2 a distance of 654.00 feet to the Northeast corner of said lot 2; thence South 88 degrees 04 minutes 01 seconds East along the South right of way of East Stoney Point School Road a distance of 64.30 feet to the Point of Beginning; having an area of approximately 41963 square feet.

read those documents together.  Because Developers' attempt to create an easement on property they owned was barred by the merger doctrine, Developers failed to create a valid easement by deed or plat as required by *Woodling,* and the documents do not fit the *Phelan* exception, we find that the Englishes' property is not subject to an easement allowing the Barnetts' use of the Driveway.

We therefore reverse the decision of the trial court entering judgment in favor of the Barnetts, enter judgment declaring the easement invalid, and remand the case for further proceedings consistent with this opinion.

_____
Karen King Mitchell, Judge

Thomas N. Chapman, Presiding Judge, and W. Douglas Thomson, Judge, concur.